Filed 3/28/13  In re I.H. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.H., a Person Coming Under the Juvenile Court Law. | B243285 (Los Angeles County Super. Ct. No. CK67945) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.H., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Amy M. Pellman, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\* \* \* \* \* \*

S.H. (Mother) appeals jurisdictional findings made with respect to her son I.H. (born May 2011).  The juvenile court sustained a petition alleging Mother's drug use, unresolved domestic violence issues related to her older son E.H. (who is not a subject of this appeal), and anger management issues, placed I.H. at risk of harm within the meaning of Welfare and Institutions Code section 300, subdivision (b).[1]  Mother contends the evidence was insufficient to show that I.H. was at substantial risk of harm.

Substantial evidence supports the dependency court's findings.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

***Mother's Prior Dependency History Concerning Her Son E.H.***

In September 2007, after the Los Angeles County Department of Children and Family Services (DCFS) filed a dependency petition on behalf of E.H., the juvenile court declared the child a dependent under section 300, subdivisions (a), and (b).  The following allegations were sustained:  (1) E.H.'s father inappropriately physically disciplined the child resulting in a bruise to the child's eye, Mother took no action to protect E.H.; and (2) E.H.'s father engaged in physical confrontations against Mother, in E.H.'s presence.  Mother was ordered to participate in parenting education, domestic violence, and individual counseling.

On February 4, 2008, after E.H. spent approximately five months in foster care, the juvenile court ordered E.H. returned to Mother's custody.

On January 16, 2009, DCFS filed a section 342 supplemental petition.  On February 18, 2009, the juvenile court sustained the following section 300, subdivisions (a), and (b) allegations:  (1) Mother and her companion ("Charlie") engaged in a violent altercation in E.H.'s presence, Charlie struck Mother causing bruising to her eye and ear, and contusions to her forehead, Charlie tied a string around Mother's neck, held her hostage, and threatened to kill her, Mother was unable to protect E.H. and

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

allowed Charlie access to E.H.; and (2) Charlie physically abused E.H., held him hostage and threatened to kill him, and Mother was unable to take action to protect E.H. when she knew of Charlie's physical abuse of E.H.

On February 18, 2009, E.H. was detained and Mother was ordered to participate in a domestic violence/abuse program, and individual counseling to address child protection, lifestyle choices, and child supervision.

On September 1, 2009, the court terminated family reunification services for Mother. E.H. was placed with his maternal grandmother who became his legal guardian.

### Events Leading to I.H.'s Detention

On January 16, 2012, DCFS received a referral alleging that Mother was abusing drugs, her boyfriend was overheard threatening to kill someone over the phone, Mother threatened to assault someone over the phone, and she referred to two young children, one of whom was identified as E.H., as "bitches." The DCFS social worker (CSW) assigned to the case visited the address reported in the referral. Mother stated that she was house sitting but refused to provide the CSW with her permanent address. She denied the referral allegations and stated that her son E.H. resided with his maternal grandmother. The CSW observed a child, later determined to be I.H.[2] Mother refused to disclose the date of birth for I.H. or the identity of I.H.'s father. The child appeared to be healthy and did not have any marks or bruises. Mother showed the CSW where she kept the formula and diapers for I.H. but refused to show the CSW the rest of the house. She told the CSW, "I know you guys like to take babies and I'm not about to have that." Mother stated she did not want to take a drug test and refused to sign any DCFS forms. She told the CSW to leave.

On January 19, 2012, Mother and I.H. met with the CSW at a Los Angeles Police Department (LAPD) station and stated that she was willing to take an on-demand drug test. On January 24, 2012, Mother called the CSW and said she refused to complete the

---

[2]      The child's birth certificate identifies the child as having the same last name as Mother, but the record indicates that Mother first identified the child with a different last name.

drug test because a staff member was watching her while she was giving the sample. When Mother was told that the allegations in the referral could not be resolved until she returned a negative test result for all substances, she went ahead with the drug test. On January 31, 2012, the CSW received the results of Mother's drug test which showed she tested positive for cannabinoids.

On February 6, 2012, in a telephone interview with DCFS, Mother initially denied using marijuana but then admitted eating a marijuana laced baked good at the medical marijuana clinic. She stated she was not a frequent user of marijuana and denied being under the influence of any substance while taking care of I.H. Mother arranged to take another drug test on February 15, 2012, but cancelled and rescheduled for the following day.

On February 16, Mother again met with the CSW at the LAPD station. Mother was living with I.H.'s paternal grandmother in Pasadena but refused to provide the CSW with the address. Mother signed an affidavit stating she was not a frequent user of marijuana. Mother's second drug test taken later that day was again positive for cannabinoids and showed higher levels than the previous test.

The telephone number Mother provided to DCFS was no longer in service and the CSW was unable to contact Mother. DCFS conducted a safety assessment and determined there was a "high risk" for future abuse or neglect because I.H. was under two years of age, Mother had a drug problem and a criminal history, and there had been prior substantiated child abuse involving physical injury to Mother's other child.

On March 8, 2012, DCFS filed a protective custody warrant request for I.H. and an arrest warrant for Mother. DCFS also filed a section 300 petition on behalf of I.H., alleging that Mother had a history of substance abuse and was a current user of marijuana. The juvenile court found that substantial danger existed to the physical or emotional health of I.H. and ordered him detained.

*Jurisdiction/Disposition Report*

The DCFS report dated April 9, 2012, indicated that Mother had surrendered I.H. to the CSW and I.H. was placed with foster parent Brenda N., who was Mother's friend. Mother refused to complete an interview with DCFS for the pretrial conference hearing and refused to allow a home assessment. DCFS attempted to make telephone contact with Mother. Mother identified herself and hung up the telephone.

*Pretrial Resolution Conference* (*April 9, 2012*)

Mother's counsel stated that Mother enrolled in Exodus Shields, an in-patient residential drug program on March 28, 2012. Mother requested I.H. be returned to her care on the condition that she continued to live at Exodus Shields. Counsel for DCFS pointed out that this was Mother's second child involved in dependency matters and Mother had only been in the drug program for 11 days and needed to show more progress. Mother's counsel argued that her previous case involved domestic violence and she had no contact with that person, there was no history of drug use, and there was no nexus to any neglect because I.H. was healthy. The juvenile court expressed its concern that little was known about Mother because she had been "completely uncooperative" with DCFS. Given Mother's prior history, the court was concerned about Mother's living arrangements and her relationships, and needed more information before releasing I.H. to her custody. The court ordered I.H. detained in foster care. DCFS was ordered to have a face-to-face meeting with Mother and the matter was set for a pre-release investigation (PRI) hearing and adjudication.

*PRI Report*

In the report dated April 20, 2012, DCFS indicated that a dependency investigator (DI) interviewed Mother on April 12, 2012, at Exodus Shields. The case manager at Exodus Shields stated that a crib would be provided for I.H. so that he could stay in Mother's bedroom. Mother reported that she was diagnosed with bipolar disorder when she was in juvenile hall and was not receiving mental health services. DCFS recommended that Mother receive a psychological evaluation and that I.H. continue to be detained.

5

*PRI Hearing (April 20, 2012)*

Mother informed the court that she was sent to juvenile camp when she was about "14" because she was fighting at school. A psychiatrist put her on medication for bipolar disorder. When her camp program ended she saw another specialist at a group home who discontinued her medication. When she was 17, she ran away from the placement she was in and got pregnant. She was sent back to juvenile camp for a four to six-month program.

The court ordered I.H. to be released to Mother on condition that she remain in the program at Exodus Shields.

*DCFS Reports*

In a last minute information for the court, filed May 31, 2012, DCFS reported that Mother tested positive for marijuana on April 2, 2012. The Exodus Shields counselor reported that Mother was attending the programs but needed to work on her "anger issues" and refrain from "threatening other clients or talking to others in a disrespectful manner." Mother was at risk of being transferred out of the program if her attitude did not improve.

Mother was interviewed at Exodus Shields for the multidisciplinary assessment team summary of findings (MAT) report. She admitted she had a history of smoking marijuana. She stated she was in the juvenile delinquency system from ages 14 to 18 for fighting and anger issues. She said there was a family history of domestic violence and she wanted to break the cycle and set a good example for her children. Mother stated she lost her Section 8 housing and lived at a number of locations since I.H. was born. She stated that she was unable to find employment in the retail or fast food industries and had never worked.

At the May 31, 2012, pretrial resolution conference, Mother requested the matter be set for trial. The court ordered DCFS to prepare a supplemental report addressing a section 301 voluntary contract.

In a last minute information for the court, dated August 6, 2012, DCFS reported that it held a team decision-making (TDM) meeting on June 25, 2012. At that meeting,

6

Mother stated that she was not willing to complete a psychological evaluation and did not want to participate in a voluntary plan for a section 301 contract. Mother appeared to be very angry throughout the meeting. The Exodus Shields counselor reported that Mother was being uncooperative and having verbal altercations with staff and other clients at the program.

### *Adjudication Hearing*

At the August 6, 2012 hearing, the court denied Mother's section 350, subdivision (c), motion to dismiss the petition.

The DCFS DI testified that she had not observed Mother under the influence of drugs, and admitted that I.H. always appeared well cared for when she saw him. Although the DI had no evidence that Mother smoked marijuana around her children or placed them in harm, she noted the positive drug tests and Mother's admission to her that she had used marijuana on a frequent basis. Mother was enrolled in an 18-month program at Exodus Shields but had mentioned on numerous occasions that she might transfer out of the program. Mother told the DI she was pregnant again and the DI was concerned that if Mother left the program at Exodus Shields, which she could legally do if the juvenile court terminated jurisdiction over the case, and started using drugs again it would endanger I.H. and her new baby. The DI noted that Mother displayed erratic behavior at the TDM in June 2012, screaming, pointing fingers, and sticking out her tongue at DCFS personnel. Mother's attitude had shown improvement since she started receiving individual counseling to address her anger management issues.

Mother testified that she did not smoke marijuana on a daily basis, did not smoke around her children, and was never under the influence when caring for the children. She testified she would remain in the program at Exodus Shields if the case was dismissed. Mother testified that she smoked marijuana for the first time on December 31, 2011. She stated that between December 31, 2011, and January 24, 2012, when she first tested

7

positive for marijuana, she smoked a "blunt"[3] of marijuana on a daily basis at her friend's house. She stopped smoking marijuana briefly for two weeks after the first positive drug test. She resumed smoking marijuana again but stopped completely after her second positive drug test in February 2012. She attributed her positive test in April to residual marijuana in her system.

Mother stated that she was seven months pregnant. She admitted smoking marijuana while she was pregnant but stated she did not realize at the time she was pregnant. Mother stated that when she smoked marijuana daily at her friend's house she dropped I.H. off with her grandmother in the mornings. She picked I.H. up each evening and took him home with her but she was not under the influence of marijuana.

The court commended Mother for her participation in the program at Exodus Shields but stated that this was "not the perfect case for dismissal." The court stated that Mother was "introduced to smoking pot and was smoking pot a lot. And without the court's intervention was likely to continue to smoke pot." The court noted that Mother had a history with another child and failed to reunify. The court conformed the petition to proof and sustained the allegation that Mother had a history of substance abuse including positive toxicology screens for marijuana which rendered her periodically incapable of providing regular care and supervision of I.H. Mother had also failed to address the issues that led to the removal of her older child E.H., and continued to demonstrate anger management issues.

The court declared I.H. a dependent of the court and ordered Mother to retain physical custody of him under DCFS supervision. The court ordered family maintenance services to include the programs Mother was already participating in and requested that her individual counseling address domestic violence issues.

---

[3]   Mother described a blunt as being slightly longer than a Marlboro cigarette, with about the same thickness.

DISCUSSION

Mother challenges the sufficiency of the evidence as to the juvenile court's finding of jurisdiction under section 300, subdivision (b), based on Mother's use of marijuana and anger management issues. Specifically Mother contends DCFS never established a nexus between Mother's marijuana use and any risk of harm to I.H., and there was no evidence that Mother had an anger management problem. We conclude that substantial evidence supports the court's finding of jurisdiction.

## I. Principles Applicable to Section 300

"The purpose of section 300 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citation.]" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

Section 300, subdivision (b), states that the following will cause a child to fall under the jurisdiction of the court and be adjudged a dependent of such court: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse."

The juvenile court's jurisdictional finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 5.684(f).)

## II. Standard of Review

"'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and

9

in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]'" [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.)

### III. Analysis

In order to make a jurisdictional finding under section 300, subdivision (b), three elements must be present: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

Neglectful conduct by Mother was demonstrated by the evidence showing her abuse of marijuana. Mother testified at the adjudication hearing that her daily routine from December 31, 2011, until January 24, 2012, consisted of leaving I.H. with her grandmother in the morning, going to her friend's house where she smoked a marijuana "blunt" and returning to pick up I.H. in the evening. The referral which alleged that Mother abused drugs and neglected her children was received by DCFS during this period. Even though Mother was taking care of I.H. on January 17, 2012 when DCFS investigated the referral allegations, and again on January 19, 2012 when Mother and I.H. met with the CSW at the LAPD station, she insisted that she never smoked marijuana when I.H. was present, and she was never under the influence when he was around. But the court could reasonably believe otherwise as Mother's credibility was questionable. Mother first denied she had a history of substance abuse and told DCFS that the first positive marijuana test resulted from her ingestion of a baked good at a medical marijuana clinic. She also initially denied she had a mental health history but later admitted that she was diagnosed with bipolar disorder while in juvenile hall.

10

Mother admitted daily marijuana use for approximately 25 days but argues that there is no evidence that this conduct led to I.H. actually suffering, or created a substantial risk that I.H. would suffer serious harm in the future. However, the juvenile court is not required to wait for actual harm to the child to occur before intervening. As stated in section 300.2, the juvenile court may act to "ensure the safety, protection, and physical and emotional well-being of children who are at risk of . . . harm." And a home "free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) Mother's substance abuse thus satisfied the last two elements of this jurisdictional finding, in that it placed I.H. at risk of future physical or emotional harm.

Mother testified that she was a new user of marijuana and claimed to have smoked it for the first time on December 31, 2011. She was aware that DCFS could detain I.H. because she told the CSW that DCFS liked "to take babies" and Mother said she was not going to allow them to take I.H. But, she agreed to a drug test only because the CSW told her that the allegations in the referral could not be resolved otherwise. She stopped smoking for two weeks when she tested positive on January 24, 2012. However, she resumed smoking and showed higher levels of marijuana when she tested positive on February 16, 2012. At the time of the August 6, 2012 adjudication hearing, Mother had completed only five months of an 18-month program at Exodus Shields. Mother told DCFS and program counselors that she considered transferring out of the program, and she could legally do so if the court terminated jurisdiction. In addition, Mother tested positive again for marijuana as late as April 2012. The record shows that Mother's most recent tests were negative for marijuana and she was showing progress in the program but "proof of current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b)." (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.) Given the foregoing evidence, the court was justified in finding that Mother had not yet proved herself to be free from marijuana and the required showing of substantial risk of harm to I.H. remained. (*Id.* at p. 1261.)

11

Mother's citation to *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 (*Jennifer A.*) does not assist her. In *Jennifer A.,* the appellate court concluded the evidence was insufficient to support the finding that returning the minors to the mother's custody would create a substantial risk of detriment pursuant to section 366.22. (*Jennifer A., supra,* at p. 1346.) In that case, the minors had not been removed from the mother's custody in the first place due to the mother's drug use, but because she had left them alone on one occasion to go to work, believing that the father (whose car had broken down, unbeknownst to her) would arrive shortly to care for them. (*Id.* at pp. 1343–1344.) At the section 366.22 hearing, the evidence showed that the mother had complied with the reunification plan, had been fully employed for two years and recently received a promotion, was cooperative with DCFS, had always acted appropriately, and had displayed appropriate parenting skills. There was no evidence of a history of mental illness, incarceration, or a substance abuse problem affecting her parenting skills. The court found that the mother's one positive drug test and several missed or diluted tests between the 12-month review report/hearing and the 18-month review report/hearing did not mean that "the children's return to [her] would create a *substantial* risk of detriment to the physical or emotional well-being of the children in light of the factors in this case militating in favor of their return." (*Jennifer A., supra,* at p. 1346.)

First, *Jennifer A.* is distinguishable procedurally. The mother in *Jennifer A.* was facing termination of services (*Jennifer A., supra,* 117 Cal.App.4th at p. 1326), and potentially the termination of parental rights. "'[I]n dependency proceedings the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home.'" (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) Here, the court found DCFS met the lower burden to bring I.H. under the court's jurisdiction.

Second, the children were removed in *Jennifer A.,* not due to the mother's drug use, but because she had left them alone on one occasion to go to work. Here, on the other hand, I.H. was ordered detained because after Mother twice tested positive for marijuana, DCFS was unable to contact her and filed a protective custody warrant request

12

for I.H. and an arrest warrant for Mother. Unlike the mother in *Jennifer A.,* Mother does not yet have a history of compliance with reunification services. The mother in *Jennifer A.* had completed 18 months of court review including completion of drug testing and drug programs and had 84 drug-free tests. (*Jennifer A., supra,* 117 Cal.App.4th at p. 1343.) Mother was uncooperative with DCFS, had completed only five months of an 18-month program at Exodus Shields, and did not have a significant number of drug-free tests.

Similarly, Mother's reliance on *In re David M.* (2005) 134 Cal.App.4th 822 (*David M.*) is misplaced. In *David M.*, the appellate court reversed the juvenile court's jurisdictional order because there was no evidence tying the mother's marijuana use to actual harm or a substantial risk of serious harm to the minors. The mother in *David M.*, tested positive for marijuana while pregnant with one child and did not receive prenatal care. However, both of her children tested negative for marijuana at birth. Mother claimed her positive drug test for marijuana metabolites was due to being in the presence of others who were using marijuana. Moreover, mother tested negative for drugs approximately 18 times during the four-month period between the detention and jurisdiction hearings, and all of the evidence of her prior substance abuse was derived from four-year-old reports. (*David M., supra,* at pp. 830–831.) The court observed, "The evidence was uncontradicted that David was healthy, well cared for, and loved, and that mother and father were raising him in a clean, tidy home." (*Id.* at p. 830.)

*David M.* is factually different from the present case in the following ways. First, Mother's drug use was recent and documented. There was no reliance on four-year-old reports to document Mother's drug use because she admitted using marijuana on a daily basis beginning on December 31, 2011, until January 24, 2012, and then using drugs again two weeks later. Second, the mother in *David M.* submitted to numerous drug tests, all of which were negative. Here, Mother initially refused to drug test, and when she ran out of excuses she tested positive, three times. Third, the mother in *David M.* was caring for her older child and there was no evidence that she was unable to care or protect him. Here, Mother's older child E.H. was detained for the second time in January 2009,

13

on allegations of domestic violence and child abuse involving Mother's boyfriend, and Mother had not reunified with him.  Thus, this case is meaningfully different from *David M.*

Mother's contention that "there was no evidence [Mother] had a current anger management problem" is meritless.  At the jurisdiction hearing, the court received into evidence DCFS reports which documented Mother's disruptive behavior at Exodus Shields.  In May 2012, Mother threatened other clients of the program and spoke disrespectfully to the program staff and clients.  In June 2012, Mother was angry throughout a TDM meeting, and the program counselors stated that she continued to have verbal altercations with staff and other clients.  According to the progress report from Exodus Shields dated August 1, 2012, Mother did not have any "anger outbursts" during the month of July, but was encouraged "to continue to address anger management in her individual therapy sessions . . . ."

It was not unreasonable for the court to infer, on the entire record here, that Mother's behavior placed I.H. at substantial risk of serious harm.  This is not a case where Mother complied with DCFS, made significant changes in her life, dealt with her substance abuse problems, and had a job and stable housing.  Rather, although Mother had taken steps to deal with the issues that resulted in I.H.'s detention, the court was not required to ignore the serious warning flags raised by her marijuana use and other behavior.

**DISPOSITION**

The dependency court's jurisdictional order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

        FERNS

We concur:

_____, P. J.

   BOREN

_____, J.

   ASHMANN-GERST

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.